756 So.2d 356 (1999)
Rayford J. LeBLANC, II
v.
William STEVENSON, III and Audubon Indemnity Company.
No. 99-885.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1999.
Writ Granted March 24, 2000.
*358 Lamont P. Domingue, Lafayette, LA, for Rayford J. LeBlanc, II.
Patrick A. Juneau, Jr., Lafayette, LA, for William Stevenson, III, et al.
*359 BEFORE: YELVERTON, THIBODEAUX, AND SULLIVAN, Judges.
THIBODEAUX, Judge.
Rayford J., LeBlanc, II, plaintiff, appeals the trial court's judgment, entered pursuant to a jury verdict, which absolved the defendant, William Stevenson, III, of any liability in causing the amputation of the majority of plaintiffs left index finger and, thus, not awarding any amount for general damages, past and future medical expenses, and past and future lost income.
We reverse the trial court's judgment that the defendant, William Stevenson, III, was not negligent in causing the plaintiffs injury. We conclude that William Stevenson, III was sixty percent at fault and Rayford LeBlanc, II was forty percent at fault in causing the injury to Rayford LeBlanc, II and assess total damages of $482,053.

I.

ISSUES
We shall consider:
1. whether the trial court erred in finding the traumatic amputation of the majority of Rayford LeBlanc's left index finger was not caused by the negligence or fault of William Stevenson, III;
2. whether Rayford LeBlanc was comparatively negligent; and,
3. the extent of damages to Rayford LeBlanc.

II.

FACTS
It is undisputed that on December 21, 1995, the plaintiff, Rayford LeBlanc, II, (hereinafter, "LeBlanc") sustained traumatic amputation of his left index finger as a result of an accident at his home in Lafayette Parish. At the time of the accident, LeBlanc was a thirty-seven-year old carpenter.
The day before the accident, LeBlanc parked his truck in the yard next to his two-car carport. Unfortunately, it rained and the ground became muddy. The truck became stuck and was immobile. On the day of the accident, LeBlanc contacted Wade Hoyt, who was qualified to dislodge the truck, to help him get his truck out of the mud; however, Mr. Hoyt could not help. Mr. Hoyt recommended that LeBlanc leave the truck alone until the mud dried. LeBlanc followed that advice.
Later that day, LeBlanc saw the defendant, William Stevenson, III, a family friend, (hereinafter, "Stevenson"). Stevenson made an offer to use his four-wheel drive Suburban to help pull LeBlanc's truck out of the mud. LeBlanc declined the offer because he was waiting for the mud to dry. After the mud dried, LeBlanc tried to contact Mr. Hoyt, but he was unable to talk to him. This was the last attempt made by LeBlanc to contact Wade Hoyt. LeBlanc and Stevenson happened to see each other later that day. At that time, Stevenson again offered his help after his buddy expressed a need for his truck the next morning. This time, LeBlanc accepted the offer. Neither man had any devices to remove the truck from the mud, so LeBlanc went to a hardware store and purchased a Tug-Em strap.
When Stevenson arrived at LeBlanc's home, he backed his truck, in line with LeBlanc's truck. LeBlanc hooked one end of the device to the frame of his truck, and Stevenson fastened the other end of the strap to his trailer hitch. The men then decided LeBlanc would get into his truck and start it and then Stevenson would try to pull him out. Before entering their respective trucks, LeBlanc told Stevenson he would signal him when it was clear to move the Suburban.
On the first attempt, the Tug-Em strap unhooked from LeBlanc's truck because the Suburban moved forward before Le-Blanc put his truck in gear. After realizing the Tug-Em strap was too short to *360 adequately pull the stranded truck, the men found a binding strap used to bind sheetrock and pipes to aid in the tugging of the truck. The binding strap was used in addition to the Tug-Em strap. Before each man reentered his vehicle, LeBlanc again stated he would give a signal to Stevenson to move his Suburban. The attempted tow was again unsuccessful. The hook from the Tug-Em strap tore through the binding strap just as LeBlanc's truck came out of the furrow. It was then decided the two pieces of the binding strap and the Tug-Em strap would be tied together.
As LeBlanc was tying the straps together, Stevenson walked away, got into his Suburban and took off. Stevenson contends he only moved the Suburban to realign it with the immobile truck. As the Suburban moved forward, the knot of the straps tightened around LeBlanc's hand. LeBlanc was tugged backwards and, as he yelled for Stevenson to stop, he heard a "loud pop."
The first joint of LeBlanc's left index finger had been pulled off. The flesh, muscles and other tissue were torn from the finger down below the second knuckle. LeBlanc's wife, Johanna, who had been watching the entire tugging attempt with the LeBlanc's four year old son, Forrest, and Forrest's playmate, rushed outside when she heard her husband shrieking for help. She saw the remaining bone in her husband's finger which had been exposed after the accident. She wrapped a large towel around his injured hand. Stevenson rushed his friend to Lafayette General Medical Center.
Dr. John Schutte was on call the afternoon of the traumatic amputation. When the doctor arrived and examined the plaintiff's finger, he quickly wanted to admit LeBlanc into the hospital in order to perform surgery. However, LeBlanc asked to be treated in the emergency room because his son's birthday was the next day. Dr. Schutte complied and proceeded to cut the bone in order to stitch the remaining skin over it. The plaintiff was released from the emergency room on the same evening.
LeBlanc testified the days following the incident were extremely painful for him. The pain medication was not helpful in alleviating the pain. According to him, "They didn't have nowhere near enough stuff." LeBlanc experienced intense "shocking" sensations in his stump. This intense "shocking" continued for approximately one year. LeBlanc participated in various physical therapy exercises. These exercises provided minimal relief. The only method of easing the pain was to numb his hand by packing it in ice. The "shocking" decreased only after Dr. Darrell Henderson, a plastic surgeon, cut more of the bone and several nerves.
LeBlanc continued to feel the shocking sensations when he bumped the stump. Problems with his stump and his hand interfered with his work. Dr. Henderson recommended another surgery which could possibly eliminate the shocking sensations and would provide a better quality of life for LeBlanc.

III.

LAW AND DISCUSSION
Unless there is a manifest error or a clearly wrong finding of fact or clearly wrong judgment by a factfinder, a court of appeal may not set aside that finding or judgment. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The appellate court must determine whether the factfinder's conclusion was a reasonable one after reviewing the record in its entirety, not whether the trier of fact was right or wrong. Mart v. Hill, 505 So.2d 1120 (La.1987); Rosell, 549 So.2d 840; Stobart, 617 So.2d 880. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony, even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's. Arceneaux *361 v. Domingue, 365 So.2d 1330 (La. 1978); Stobart, 617 So.2d 880; Rosell, 549 So.2d 840.
Rosell and Stobart instruct us that a de novo review is warranted upon determining that the factfinder was clearly wrong or manifestly erroneous. We are then empowered to "render any judgment which is just, legal, and proper upon the record on appeal." La.Code Civ.P. art. 2164.

Liability of William Stevenson, III
LeBlanc contends the jury erred in finding the defendant, William Stevenson, III, free of fault or negligence in causing the traumatic amputation of his finger. We agree.
For Stevenson to be found liable, Le-Blanc must prove negligence under the following five parts of the duty/risk analysis:
1. the defendant had a duty to conform his or her conduct to a specific standard of care;
2. the defendant failed to conform his or her conduct to the appropriate standard;
3. the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries;
4. the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and,
5. actual damages.
Roberts v. Benoit, 605 So.2d 1032 (La. 1991). For the plaintiff to recover, he must prove all the elements. Failure to prove one element results in the inability to recover on a negligence theory. Mathieu v. Imperial Toy Corp., 94-952 (La.11/30/94); 646 So.2d 318.

Duty
Whether a duty exists is a question of law. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). Appellate review of a question of law is simply a review of whether the trial court was legally correct or legally incorrect. O'Niell v. Louisiana Power & Light Co., 558 So.2d 1235 (La.App. 1 Cir.1990). The existence of a duty and the scope of liability resulting from the breach of that duty must be determined according to the facts and circumstances of each case. Fowler v. Roberts, 556 So.2d 1 (La.1989).
A review of the facts reveals Stevenson offered his assistance to tow Le-Blanc's truck out of the mud on two occasions. Upon LeBlanc's acceptance of the second offer, Stevenson assumed the responsibility of one who is able or willing to accept the risks involved in towing a vehicle. With this responsibility, he had a duty to act as a reasonable and prudent person exercising ordinary care under the circumstances.

Breach of duty
Once a duty has been established, the issue becomes whether Stevenson breached that duty because he failed to perform his duty in a reasonable and prudent manner and whether the breach of the duty caused the injuries to LeBlanc. The court must find that one's conduct fell below the standard required of a reasonable and prudent person under similar circumstances. Black v. State, Through Dep't of Public Safety and Corrections, 94-1305 (La.App. 3 Cir. 5/17/95); 657 So.2d 270, writs denied, 95-1528, 95-1546 (La.9/29/95); 660 So.2d 876. The facts specifically reveal that Stevenson was not to move his Suburban until LeBlanc gave him a signal; however, he moved the Suburban without receiving a signal. Although Stevenson contends the moving of the Suburban which caused the accident was only an attempt to realign his vehicle with the immobile truck, he had a duty to inform LeBlanc of his intentions. Stevenson moved the Suburban on his belief that LeBlanc had completed his task of tying the devices together. Stevenson's failure to await and act either upon obtaining LeBlanc's signal or after informing LeBlanc *362 of his intent to realign his Suburban is the basis of our finding that the defendant breached his duty to the plaintiff. Stevenson had a duty to protect LeBlanc from the risk of injury or danger that was involved in towing a truck by two unqualified men.
Both parties were unskilled in this towing procedure. However, this did not eliminate Stevenson's duty to act responsibly. When a duty is imposed upon one person for the purpose of eliminating a risk of injury resulting from another's own inattention, lack of skill or negligence, the fact that the second person was inattentive, unskillful or negligent cannot free the first person from responsibility for breach of duty to protect against precisely the fault that occurred. Oliver v. Capitano, 405 So.2d 1102 (La.App. 4th Cir.), writs denied, 407 So.2d 731 and 407 So.2d 734 (1981). A failure to adhere to or to obey protective instructions, such as an all-clear signal, in a situation where there is a possibility of causing great injury is a breach of the duty to protect.

Cause-In-Fact
LeBlanc contends Stevenson's failure to obey protective instructions was a cause of his injuries. We agree.
The only requirement for conduct to be a cause-in-fact of the harm complained of is that it be a "substantial factor in bringing about that harm." Dixie Drive It Yourself System New Orleans Co., Inc. v. American Beverage Co., 242 La. 471, 482, 137 So.2d 298, 302 (1962). Cause-in-fact is primarily a "but-for" test; the accident would not have occurred but for the conduct of the defendant. Ortego v. Roy Motors, Inc., 95-1638 (La.App. 3 Cir. 11/27/96); 690 So.2d 780.
In this case, the overwhelming evidence and facts are that Stevenson's Suburban was moved before a signal was given and that LeBlanc sustained his amputation as a result of the attempt to tow without receiving the protective signal. Stevenson acknowledged that he did not receive a signal from LeBlanc; LeBlanc indicated that Stevenson was not looking at him. Furthermore, Stevenson also confessed the accident would not have happened if he had not moved his Suburban. In other words, but for Stevenson's moving of the Suburban without receiving or giving a signal, the traumatic amputation of Le-Blanc's finger would not have occurred.

Scope of Liability/Protection
This prong of duty/risk has also been called legal causation. Legal causation "requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character." Roberts, 605 So.2d at 1056, quoting Sinitiere v. Lavergne, 391 So.2d 821, 825 (La.1980). In Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972), the supreme court endorsed an ease of association test which asks how easily the risk of harm can be associated with the rule which was breached.
In this case, the duty accepted by Stevenson when he assisted LeBlanc in towing his truck out of the muddy area was to do so in a safe and a protective manner. The risk of harm which confronted LeBlanc and the traumatic amputation can be easily associated with Stevenson's failure to act in a reasonable and prudent manner by not following the protective instructions.

Apportionment of Fault
Although Stevenson's negligent conduct led to the traumatic amputation of LeBlanc's left index finger, LeBlanc is not free of fault in this accident. Where an alleged tortfeasor is found to be blameless by a factfinder and comparative fault is, therefore, not assessed between the parties, an appellate court is not compelled to apply the manifestly erroneous standard of review and the Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) methodology in lowering or raising the percentages *363 of fault. Rather, as in a situation where no damages are awarded, we are free to assess what the record suggests are appropriate degrees of fault.
Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985) listed factors which establish a gauge by which fault is allocated:
1. whether the conduct resulted from inadvertence or involved an awareness of the danger;
2. how great a risk was created by the conduct;
3. the significance of what was sought by the conduct;
4. the capacities of the actor, whether superior or inferior, and
5. any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
In this case, it is undisputed that Mr. Wade Hoyt recommended that LeBlanc allow the mud to dry before attempting to move the lodged truck. It is also undisputed that LeBlanc did not await the help of a professional once the mud dried and after he was unable to contact Hoyt. Instead, he acquiesced in Stevenson's offer to move the truck, although he was fully cognizant of his and Stevenson's lack of skill and qualification to complete such a task. Although LeBlanc is not a professional or skilled towing expert, he had a duty to act reasonably and not to subject himself to the danger associated with the dislodging of a vehicle without the assistance of a qualified individual. By failing to await the assistance of Mr. Hoyt, LeBlanc significantly increased his risks of incurring danger and/or injury to himself.
LeBlanc asserted he needed his truck for work on December 22, 1995. That need was diminished in light of the fact that the lodged truck was not his only truck. LeBlanc testified he had seen and spoken with Stevenson on two occasions earlier on December 21, 1995, the day of the accident. It was during the first conversation that Stevenson remarked about LeBlanc's new truck, which LeBlanc was driving at the time, and he asked LeBlanc the whereabouts of his brown truck. At this time, LeBlanc disclosed the immobility of the truck because it was embedded in mud in his yard.
As the owner of the immobile truck, LeBlanc had the option either to accept or to reject Stevenson's offer. Also, LeBlanc's ownership of another vehicle lessened his urgency to dislodge the brown truck. Thus, there was no extenuating or emergency circumstance which would require him to act in haste and without regard of possible harm and danger.
Clearly, the facts reasonably support our conclusion that LeBlanc did not exercise a reasonable degree of care for his own safety and protection and, therefore, is comparatively negligent, or at fault, for the traumatic amputation of his left index finger. We assign forty percent of the fault to him. This finding, however, does not defeat LeBlanc's ability to recover damages, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence. La.Civ.Code art. 2323.

Damages
LeBlanc sustained a traumatic amputation of his left index finger. He underwent extensive medical treatment to salvage it and experienced a great loss of tissue and skin. He had an eighty percent impairment of his left index finger, twenty percent impairment of his left hand, eighteen percent impairment of his left arm and eleven percent impairment of his entire body. As a result of his injury, Le-Blanc has had to refrain from the activities of a normal forty-one-year old man. He has had to limit his playtime with his young sons, and he has experienced problems in his marriage to Johanna as a result of the pain and aggravation of the amputation. During trial, it was revealed that he and Johanna had separated because of the aftermath of the accident. LeBlanc, who *364 was a vibrant and productive carpenter, has had difficulty in returning to work in a normal capacity. His pain has been excruciating, and he will experience discomfort for the balance of his life. As such, we believe an award of $100,000 in general damages is justified.

Past Medical Expenses
LeBlanc is entitled to recover the medical expenses incurred by him for treatment of his amputated finger. A plaintiff may recover reasonable medical expenses, past and future, which he incurs as a result of an injury; however, a plaintiff must prove the existence of the injuries and a causal connection between those injuries and the accident. "The test is whether plaintiff has shown through medical testimony that more probably than not the subsequent medical treatment was necessitated by the trauma suffered in the accident." Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144, 156 (La.App. 3 Cir.), writ denied, 565 So.2d 450 (La.1990); Wells v. Allstate Ins. Co., 510 So.2d 763 (La.App. 1 Cir.), writ denied, 514 So.2d 463 (La.1987).
In this case, the record clearly indicates the amputation of LeBlanc's left index finger resulted in past medical expenses which total $7,459. These expenses are recoverable in full.

Future Medical Expenses
Dr. Henderson recommended a surgical procedure called ray amputation because LeBlanc was still having problems with his hand and he was restricted from heavy manual labor. With this procedure, the stump is amputated and tendons controlling the index finger are attached to the long finger to give it more use. The ray amputation would result in a larger disability, but would probably give LeBlanc better use of his hand. As such, LeBlanc is entitled to recover $5,698 for future medical expenses in order to cover the costs of this recommended surgical procedure.

Past Lost Income
Dr. Roy Douglas Womack, an economist, calculated LeBlanc's past lost income by multiplying the number of years between the accident and the time of trial times the amount of his annual difference in earnings attributable to the injury. LeBlanc's average annual earnings for three years prior to the accident was $39,684. His average annual earnings for the three years between the accident and trial were $21,087. Dr. Womack calculated the difference between the two and determined LeBlanc's past lost annual income was $18,597. He proceeded to multiply that amount times 2.95 years, the number of years between the accident and trial, and concluded LeBlanc suffered a past lost income of $54,861. This methodology and the calculations are reasonable. Accordingly, we conclude LeBlanc is entitled to recover $54,861 for past lost income.

Loss of Future Income
We find the amount of $314,035 closely recompenses LeBlanc for his loss of future income and earning capacity.
In determining an award for loss of future earning capacity, we are guided by certain well-established legal principles. This court has stated:
Earning capacity itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
Fitch v. Vintage Petroleum, Inc., 94-346 p. 11 (La.App. 3 Cir. 11/2/94); 652 So.2d 998, 1003, quoting Veazey v. State Farm Mut. Auto. Ins., 587 So.2d 5, 7 (La.App. 3 Cir. 1991). Furthermore,
the full indemnification to which an injured party is entitled under Article *365 2315 (Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971)) includes damages for decreased earning capacity which is determined by deducting plaintiff's earning ability after the injury from his earning ability immediately prior to the injury rather than by deducting his income prior to the injury. The Court of Appeal on original hearing emphatically rejected defendant's argument and said:
"Wages at time of injury are usually suggestive of the individual's future earnings. This is not an absolute unvarying rule. In many instances, changes in work and increase of earnings would be more probable. The law does not destine an injured party to his situation at the time of injury. It would be unrealistic and unjust to accept defendant's argument. In Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir.1974) it was said:
`... Moreover, loss of wages can properly be computed on the amount the plaintiff would in reasonable probability have been earning at time of trial, although he was earning less at the time of the accident. James v. State, 154 So.2d 497 (La.App. 4th Cir. 1963).'" [Coco v. Winston Industries, Inc.], 330 So.2d [649] at 666 [(La.App. 3rd Cir.1976)].
We believe that the foregoing passage from the Court of Appeal opinion on original hearing properly applies the governing legal principles.
Coco, 341 So.2d at 338-39.
The plaintiff's expert economist, Dr. Roy Womack, testified that LeBlanc's average annual earnings for the three years preceding the accident was $39,684. He also testified that LeBlanc's average annual earnings for the three years following the accident was $21,087. He subtracted the post-accident average from the pre-accident average and reached a total of $18,597. He utilized a 3.5 percent growth rate and a 5.1 percent discount rate, and multiplied the result by 19.72 years, LeBlanc's expected future work life. The total was $314,035. This was labeled LeBlanc's lost earning capacity.
We recognize that Dr. Womack's focus was on pre and post-injury wages. In adopting that analysis as a proper basis for determining the loss of future earning capacity in this case, we do not mean to suggest the appropriateness of this methodology in all cases. Indeed, our determination is not to be taken as an absolute rule. Previous cases have made this quite clear. See, e.g., Fitch, 652 So.2d 998; Coco, 341 So.2d 332. Certainly, sole concentration on wages is not improper in some cases such as this one. However, it would be inappropriate if other variables were present and definitively scrutinized. Those variables, the evidence suggests, were absent in this case. Glenn Hebert, the plaintiffs vocational rehabilitation consultant, expressed the opinion that "this [was] a very difficult case to analyze." Although Hebert opined that LeBlanc had the capacity to perform a leaderman's job before the accident, the record is silent on what the loss of that capacity meant in economic terms. Furthermore, there is a lack of testimony regarding potential increases in earnings or changes in work status. Essentially, we are limited as a practical matter to a comparison of pre and post-injury wages to determine loss of future earning capacity. Given the circumstances of this case, Dr. Womack's calculations are reasonably based.

IV.

CONCLUSION
For the foregoing reasons, we reverse the judgment of the trial court. We conclude that William Stevenson, III is sixty percent negligent and Rayford LeBlanc, II is forty percent negligent for causing the accident of December 21, 1995 and the consequent injuries to Rayford LeBlanc, II. We award $100,000 in general damages, $7,459 in past medical expenses, $5,698 in future medical expenses, $54,861 in past *366 lost income, and $310,035 in loss of future earning capacity to Rayford LeBlanc, II, subject to a reduction of forty percent for his comparative negligence. Interest shall accrue from the date of judicial demand.
Costs of all proceedings shall be apportioned between Rayford LeBlanc, II and William Stevenson, III and his insurer, Audubon Indemnity Company in proportion to their respective degrees of fault.
REVERSED AND RENDERED.